JS 44   (Rev. 06/17)

WB    WB    **CIVIL COVER SHEET**    19-cv-1510

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
KPH Healthcare Services, a/k/a Kinney Drugs, Inc., individually, and on behalf of all others similarly situated.

**DEFENDANTS**
Amgen, Inc., et al.

19    1510

**(b)** County of Residence of First Listed Plaintiff    St. Lawrence County, NY
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Ventura Country, CA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
NastLaw LLC, 1101 Market Street, Suite 2801, Philadelphia, PA 19107
Phone: 215-923-9300

Attorneys *(If Known)*
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market St
Wilmington, DE  19899

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

❑ 1  U.S. Government
       Plaintiff

☒ 3  Federal Question
       *(U.S. Government Not a Party)*

❑ 2  U.S. Government
       Defendant

❑ 4  Diversity
       *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❑ 1 | ❑ 1 | Incorporated *or* Principal Place of Business In This State | ❑ 4 | ❑ 4 |
| Citizen of Another State | ☒ 2 | ❑ 2 | Incorporated *and* Principal Place of Business In Another State | ❑ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ❑ 3 | ❑ 3 | Foreign Nation | ❑ 6 | ❑ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❑ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❑ 625 Drug Related Seizure of Property 21 USC 881 | ❑ 422 Appeal 28 USC 158 | ❑ 375 False Claims Act |
| ❑ 120 Marine | ❑ 310 Airplane | ❑ 365 Personal Injury - Product Liability | ❑ 690 Other | ❑ 423 Withdrawal 28 USC 157 | ❑ 376 Qui Tam (31 USC 3729(a)) |
| ❑ 130 Miller Act | ❑ 315 Airplane Product Liability | ❑ 367 Health Care/ Pharmaceutical | | | ❑ 400 State Reapportionment |
| ❑ 140 Negotiable Instrument | ❑ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☒ 410 Antitrust |
| ❑ 150 Recovery of Overpayment & Enforcement of Judgment | ❑ 330 Federal Employers' | Product Liability | | ❑ 820 Copyrights | ❑ 430 Banks and Banking |
| ❑ 151 Medicare Act | Liability | ❑ 368 Asbestos Personal Injury Product | | ❑ 830 Patent | ❑ 450 Commerce |
| ❑ 152 Recovery of Defaulted | ❑ 340 Marine | Liability | | ❑ 835 Patent - Abbreviated New Drug Application | ❑ 460 Deportation |
| Student Loans (Excludes Veterans) | ❑ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ❑ 840 Trademark | ❑ 470 Racketeer Influenced and Corrupt Organizations |
| ❑ 153 Recovery of Overpayment of Veteran's Benefits | ❑ 350 Motor Vehicle | ❑ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ❑ 480 Consumer Credit |
| ❑ 160 Stockholders' Suits | ❑ 355 Motor Vehicle Product Liability | ❑ 371 Truth in Lending | ❑ 710 Fair Labor Standards Act | ❑ 861 HIA (1395ff) | ❑ 490 Cable/Sat TV |
| ❑ 190 Other Contract | ❑ 360 Other Personal Injury | ❑ 380 Other Personal Property Damage | ❑ 720 Labor/Management Relations | ❑ 862 Black Lung (923) | ❑ 850 Securities/Commodities/ Exchange |
| ❑ 195 Contract Product Liability | ❑ 362 Personal Injury - Medical Malpractice | ❑ 385 Property Damage Product Liability | ❑ 740 Railway Labor Act | ❑ 863 DIWC/DIWW (405(g)) | ❑ 890 Other Statutory Actions |
| ❑ 196 Franchise | | | ❑ 751 Family and Medical Leave Act | ❑ 864 SSID Title XVI | ❑ 891 Agricultural Acts |
| | | | | ❑ 865 RSI (405(g)) | ❑ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❑ 790 Other Labor Litigation | | ❑ 895 Freedom of Information Act |
| ❑ 210 Land Condemnation | ❑ 440 Other Civil Rights | **Habeas Corpus:** | ❑ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ❑ 896 Arbitration |
| ❑ 220 Foreclosure | ❑ 441 Voting | ❑ 463 Alien Detainee | | ❑ 870 Taxes (U.S. Plaintiff or Defendant) | ❑ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❑ 230 Rent Lease & Ejectment | ❑ 442 Employment | ❑ 510 Motions to Vacate Sentence | | ❑ 871 IRS—Third Party 26 USC 7609 | |
| ❑ 240 Torts to Land | ❑ 443 Housing/ Accommodations | ❑ 530 General | | | ❑ 950 Constitutionality of State Statutes |
| ❑ 245 Tort Product Liability | ❑ 445 Amer. w/Disabilities - Employment | ❑ 535 Death Penalty | **IMMIGRATION** | | |
| ❑ 290 All Other Real Property | ❑ 446 Amer. w/Disabilities - Other | **Other:** | ❑ 462 Naturalization Application | | |
| | ❑ 448 Education | ❑ 540 Mandamus & Other | ❑ 465 Other Immigration Actions | | |
| | | ❑ 550 Civil Rights | | | |
| | | ❑ 555 Prison Condition | | | |
| | | ❑ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original
     Proceeding

❑ 2 Removed from
     State Court

❑ 3 Remanded from
     Appellate Court

❑ 4 Reinstated or
     Reopened

❑ 5 Transferred from
     Another District
     *(specify)*

❑ 6 Multidistrict
     Litigation -
     Transfer

❑ 8 Multidistrict
     Litigation -
     Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. section 1
Brief description of cause:
anticompetitive scheme to restrain competition in the market for Sensipar drug

**VII. REQUESTED IN
COMPLAINT:**
☒ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $
in excess of $5 million

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes    ❑ No

**VIII. RELATED CASE(S)
IF ANY**
*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

APR -9 2019

DATE
04/09/2019

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

**WB**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**19    1510**

DESIGNATION FORM
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 6333 NY-298, East Syracuse, NY 13057 _____

Address of Defendant: _____ One Amgen Center Drive, Thousand Oaks, CA  91320 _____

Place of Accident, Incident or Transaction: _____ United States _____

---

*RELATED CASE, IF ANY:*

Case Number: _____    Judge: _____    Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☐    No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes ☐    No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?    Yes ☐    No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?    Yes ☐    No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 04/09/2019    _____ *Attorney-at-Law / Pro Se Plaintiff* _____    24424  *Attorney I.D. # (if applicable)*

---

CIVIL: (Place a √ in one category only)

**A.    Federal Question Cases:**

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☑ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☑ 4. Antitrust
- ☐ 5. Patent
- ☑ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify):* _____

**B.    Diversity Jurisdiction Cases:**

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Dianne M. Nast _____, counsel of record *or pro se plaintiff*, do hereby certify:

- ☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

- ☐ Relief other than monetary damages is sought.

APR  -9 2019

DATE: 04/09/2019    _____ *Attorney-at-Law / Pro Se Plaintiff* _____    24424  *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| KPH Healthcare Services Inc., individually | : | CIVIL ACTION |
| and on behalf of all others similarly situated | : | |
| v. | : | **19**     **1510** |
| Amgen, Inc., et al. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.     ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.     ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.     ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.     ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)     (x)

(f) Standard Management – Cases that do not fall into any one of the other tracks.     ( )

| | | |
|---|---|---|
| 4/9/2019 | *[signature]* | Plaintiff and Class |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-923-9300 | 215-923-9302 | dnast@nastlaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

APR - 9 2019

#400

**WB**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KPH HEALTHCARE SERVICES, INC., a/k/a KINNEY DRUGS, INC., individually and on behalf of all others similarly situated, | : : : | Case No.: **19    1510** |
| | : | |
| Plaintiff, | : | CLASS ACTION |
| v. | : : | |
| AMGEN, INC., | : | DEMAND FOR JURY TRIAL |
| TEVA PHARMACEUTICALS USA, INC., | : | |
| WATSON LABORATORIES, INC., | : | |
| WATSON PHARMACEUTICALS, INC., | : | |
| ACTAVIS PHARMA, INC., and | : | |
| ACTAVIS PLC, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## COMPLAINT

Plaintiff KPH Healthcare Services, Inc., a/k/a Kinney Drugs, Inc. ("Plaintiff" or "KPH"), on behalf of itself and all others similarly situated, files this Complaint against Defendants Amgen Inc. ("Amgen"), Teva Pharmaceuticals USA, Inc., Watson Laboratories, Inc., Watson Pharmaceuticals, Inc., Actavis Pharma, Inc., and Actavis plc (collectively, "Teva"). Plaintiff's claims arise from Defendants' anticompetitive scheme to restrain competition in the market for Sensipar® and its AB-rated generic equivalents sold in the United States. Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## I.    NATURE OF THE ACTION

1. Plaintiff seeks damages and equitable relief arising from Defendants' anticompetitive agreement, which eliminated generic competition in the United States for branded and generic versions of Sensipar (cinacalcet hydrochloride tablets).

2. Sensipar is a drug used to treat certain conditions associated with chronic kidney disease and thyroid cancer.

3. Amgen received FDA approval for Sensipar in March 2004.

4. After launch, Sensipar's sales grew rapidly. As of 2017, Amgen's U.S. sales of Sensipar exceeded $1.3 billion annually.

5. Because Sensipar was a blockbuster drug, numerous generic manufacturers filed Abbreviated New Drug Applications ("ANDAs") with the FDA seeking the approval of generic versions of Sensipar. Teva was one such generic.

6. Other generic manufacturers filing ANDAs included Aurobindo Pharma, Hetero Labs, Apotex, Sun Pharmaceutical Industries, Cipla Ltd., Mylan Pharmaceuticals, Amneal Pharmaceuticals, Dr. Reddy's Laboratories, Breckenridge Pharmaceutical, Micro Labs, Piramal Healthcare, Strides Pharma, Ajanta Pharma, and Zydus Pharmaceuticals.

7. As part of their applications, these generic manufacturers were required to make certain certifications against the patents covering Sensipar. Among these patents was U.S. Patent No. 9,375,405 ("the '405 patent"), "Rapid dissolution formulation of a calcium receptor-active compound." Generic manufacturers filed "Paragraph IV" certifications against the '405 patent, stating that the patent was invalid, unenforceable, or not infringed by the proposed ANDA applicants' generics.

8. Amgen sued each generic manufacturer that filed an ANDA for allegedly infringing the '405 patent. While many of the generics thereafter settled with Amgen, a few—including Teva, Amneal, Piramal, and Zydus—continued litigating.

9. A bench trial in the Court (Goldberg, D.J.) was held in March 2018. After the submission of post-trial briefs, in July 2018 the Court issued an opinion, finding that Teva,

Amneal, and Piramal's generic versions of Sensipar did not infringe the '405 patent. *See Amgen Inc. v. Amneal Pharm. LLC*, 328 F. Supp.3d 373 (D. Del. 2018). In September 2018, Amgen appealed the Court's noninfringement ruling to the Federal Circuit.[1]

10. With Amgen's appeal pending, on December 27, 2018, the FDA approved Teva's ANDA for a generic version of Sensipar.

11. The recipient of a non-infringement judgment, Teva immediately launched its generic product. During the one week that followed, Teva flooded the market with roughly six weeks of product sales. Teva itself reportedly realized approximately *$59 million* in profits (assuming at 25% discount off Sensipar's price), while Amgen lost an estimated *$79 million* in profits.[2]

12. With Teva competing in the market, Amgen had limited options: either apply to the trial or appellate court for a stay of the non-infringement order and an injunction against Teva— or engage in self-help.

13. Instead of applying for relief in court, Amgen chose self-help—and broke the law. On January 2, 2019, Teva and Amgen entered a confidential agreement in which Teva agreed to stop selling its generic version of Sensipar. Public reports also stated that the agreement: (1) ended Amgen's appeal against Teva; (2) required Teva to delay any further sales for nearly two and a half years, until mid-year 2021; (3) called on Teva to pay Amgen an undisclosed sum; and (4) called on Amgen to pay Teva for licenses to other Teva products.

14. Amgen's quickly-reached deal with Teva re-established and maintained Amgen's brand monopoly. Moreover, the deal eliminated not only Teva as a competitor but other generics

---

[1] *Amgen Inc. v. Amneal Pharms. LLC, et al.*, No. 1:16-cv-00853 (D. Del.), Dkt. #397. The Court also found that Zydus's proposed generic product would infringe the '405 patent. *See Amgen*, 328 F. Supp.3d at 399-400. Zydus has appealed that part of the decision to the Federal Circuit. *See Amgen Inc. v. Amneal Pharmaceuticals LLC, et al.*, No. 1:16-cv-00853 (D. Del.), Dkt. #406.
[2] Sue Sutter, *Launch Abbreviated: Teva Halts US Generic Sensipar Sales After Patent Deal With Amgen*, Pink Sheet (Jan. 3, 2019).

as well. Amgen's '405 patent action settlements, include acceleration clauses, which permit the generics to enter the market after a short delay if another generic, like Teva, launched. The hasty deal between Amgen and Teva avoided triggering the acceleration clauses, thereby preventing other settling generics from launching their products. Amgen and Teva thus stopped other generics from entering and driving the price of Sensipar well below Teva's discount.

15. Absent Defendants' unlawful agreement, Plaintiff and the members of the Class would have been able to purchase generic Sensipar tablets during the period after January 2, 2019 at significantly lower prices than Amgen has charged since then. Indeed, the injury to Plaintiff and the Class is ongoing, as there still is no generic alternative to Amgen's branded Sensipar available to purchase.

16. An agreement by competing companies to cease competing is "anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other."[3] Accordingly, to redress the economic injury Defendants have already caused—and continue to cause—Plaintiff, on behalf of itself and all others similarly situated, seeks damages, injunctive and other equitable relief under the federal antitrust laws.

## II.    JURISDICTION AND VENUE

17. This Court has jurisdiction over the subject matter of this action as it arises under Section 1 of the Sherman Act, 15 U.S.C. § 1 and under 28 U.S.C. §§ 1331 and 1337 because this action seeks injunctive and equitable relief under the Clayton Act, 15 U.S.C. § 26. This Court also has jurisdiction under Clayton Act § 12, 15 U.S.C. § 22.

18. This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class exceeds

---

[3] *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990).

4

$5,000,000, and at least one member of the Class is a citizen of a state different from that of one of Defendants.

19. Venue is appropriate in this District under 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §1391(b). Defendants reside, transact business, are found, or have agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District. Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District. Moreover, the effects of Defendants' conduct on interstate trade or commerce are ongoing.

20. This Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of causing injury to, persons residing in, located in, or doing business throughout the United States, including in this District.

III.    **THE PARTIES**

21. Plaintiff KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. ("KPH") is a corporation organized under the laws of the state of New York, with headquarters in Gouverneur, New York. KPH operates retail pharmacies in the Northeast under the name Kinney Drugs, Inc. During the Class Period, KPH directly purchased branded and generic versions of Sensipar. As a result of Defendants' anticompetitive scheme, KPH paid supracompetitive prices of its purchases and KPH was injured by the illegal conduct alleged herein.

22. Defendant Amgen Inc. ("Amgen") is a Delaware corporation with its principal place of business at One Amgen Center Drive, Thousand Oaks, California 91320. Amgen is the holder of NDA #021688 and sells Sensipar throughout the United States.

23. Defendant Teva Pharmaceuticals USA, Inc. ("Teva Pharmaceuticals") is a Delaware corporation with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454. Teva Pharmaceuticals launched generic Sensipar at the end of 2018 and entered the agreement with Amgen, from which this action arises. The relation between Teva Pharmaceuticals and the non-Amgen defendants is described below.

24. Defendant Watson Laboratories, Inc. ("Watson") is a Nevada corporation with its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054. Watson is a direct or indirect subsidiary of Teva Pharmaceuticals. Watson is a defendant in Amgen's Sensipar patent infringement suit and is a beneficiary, directly or indirectly, of the Amgen-Teva agreement from which this action arises. Watson is the holder of ANDA #204377 for generic Sensipar tablets.

25. Defendant Watson Pharmaceuticals, Inc. is a company organized and existing under the laws of Nevada, having its principal place of business at 400 Interplace Parkway, Parsippany, New Jersey 07054. Effective on or about January 24, 2013, Watson Pharmaceuticals, Inc. changed its name to Actavis, Inc. Actavis, Inc. changed its name to Actavis, plc on or about October 1, 2013.

26. Defendant Actavis plc is a company organized and existing under the laws of Ireland, having its principal place of business at 1 Grand Canal Square, Docklands Dublin 2, Ireland. Actavis plc also has a place of business at 400 Interplace Parkway, Parsippany, New Jersey 07054.

27. Defendant Actavis Pharma, Inc. ("Actavis Pharma") is a Delaware corporation with its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054. Actavis Pharma is a direct or indirect subsidiary of Teva Pharmaceuticals. Actavis Pharma is a defendant in Amgen's Sensipar patent infringement suit and is a beneficiary, directly or indirectly, of the Amgen-Teva agreement from which this action arises. Actavis Pharma is the packager of Teva's generic Sensipar.

28. Defendants Teva Pharmaceuticals, Watson Laboratories, Watson Pharmaceuticals, Actavis Pharma, and Actavis PLC are collectively referred to as "Teva." Between December 27, 2018 and January 2, 2019, Teva sold throughout the United States generic Sensipar under Watson's ANDA.

29. Defendants Amgen and Teva are collectively referred to as "Defendants."

30. All of Defendants' actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged in this Complaint. These actions were authorized, ordered, or undertaken by Defendants' various officers, agents, employees, or other representatives while engaged in the management of Defendants' affairs (or those of their predecessors-in-interest) within the course and scope of their duties and employment or with the actual, apparent, and/or ostensible authority of Defendants.

## IV.    LEGAL AND REGULATORY BACKGROUND

### A.    The Regulatory Structure for Approval of Generic Drugs and Substitution of Generics for Brand Name Drugs

31.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers who create a new drug product must obtain the approval of the FDA to sell the new drug by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301-392.

7

32.    An NDA must include submission of specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.  21 U.S.C. §§ 355(a) & (b).

33.    When the FDA approves a brand name manufacturer's NDA, the brand manufacturer may list any patents that the brand manufacturer believes could reasonably be asserted against a generic manufacturer who makes, uses, or sells a generic version of the brand name drug prior to the expiration of the listed patents in the FDA's book of Approved Drug Products with Therapeutic Equivalence Evaluations, commonly referred to as the "Orange Book."

34.    Patents issued after NDA approval may be listed within 30 days of issuance.  21 U.S.C. §§ 355 (b) (1) & (c) (2).

35.    A patent applicant is subject to special oaths and duties, such as the duties of disclosure, candor, and good faith, during patent prosecution. A patent applicant is required to disclose to the PTO of "all information known . . . to be material to patentability" including with respect to prior art.  *See* 37 C.F.R. § 1.56.  This duty extends to all inventors named on a patent application and any "attorney or agent who prepares or prosecutes the application," as well as "[e]very other person who is substantively involved in the preparation or prosecution of the application." *Id.* § 1.56(c).[4]

36.    The FDA relies completely on the brand name manufacturer's truthfulness about patents' validity and applicability; the FDA has neither the authority nor the resources to check the manufacturer's representations for accuracy or trustworthiness.

---

[4]    Where fraud on the PTO "was practiced or attempted" or the duty of disclosure, candor, and good faith "was violated through bad faith or intentional misconduct" no patent should be granted. *Id.* § 1.56(a).

8

**B.    The Hatch-Waxman Amendments Advanced the Goal of Providing Access to Generic Pharmaceuticals.**

37.    The Hatch-Waxman Amendments enacted in 1984 simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs. *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

38.    A generic manufacturer seeking approval to sell a generic version of a brand name drug may now file an ANDA.

39.    An ANDA relies on the scientific findings of safety and effectiveness included in the brand name drug manufacturer's original NDA, but must show that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand name drug – that is, that the generic drug is bioequivalent to the brand name drug.

40.    The FDA assigns generic drugs that are bioequivalent to branded drugs an "AB" rating.

41.    The FDCA and Hatch-Waxman Amendments operate on the presumption that bioequivalent drug products containing identical amounts of the same active ingredients in the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity and identity, are therapeutically equivalent and may be substituted for one another.  Thus, bioequivalence demonstrates that the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart.  21 U.S.C. § 355(j) (8) (B).

42.    Through the Hatch-Waxman Amendments, Congress sought to expedite the entry of generic drugs, thereby reducing healthcare expenses nationwide.

43. Congress also wanted to protect pharmaceutical companies' incentives to create new and innovative products.

44. The Hatch-Waxman Amendments achieved both goals, substantially advancing the rate of generic product launches, and ushering in an era of historic high profit margins for brand name pharmaceutical companies.

45. In 1983, pre-Hatch Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic versions available; by 1998, nearly all did. In 1984, prescription drug revenue for branded and generics totaled $21.6 billion and generic drugs accounted for 18.6% of prescriptions.

46. By 2009, total prescription drug revenue had soared to $300 billion and generic drugs accounted for 75% of prescriptions.

### C. ANDA Patent Certifications Provide Incentives to Generic Manufacturers to Challenge Patents.

47. To obtain FDA approval of an ANDA, a generic manufacturer must certify that the generic drug addressed in its ANDA will not infringe any patents listed in the Orange Book. Under Hatch-Waxman, a generic manufacturer's ANDA must contain one of four certifications:

     i.    that no patent for the brand name drug has been filed with the FDA (a "Paragraph I certification");

     ii.    that the patent for the brand name drug has expired (a "Paragraph II certification");

     iii.    that the patent for the brand name drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III certification"); or

     iv.    that the patent for the brand name drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").

48.   If a generic manufacturer files a Paragraph IV certification, a brand name manufacturer has the ability to delay FDA approval of an ANDA simply by suing the ANDA applicant for patent infringement.

49.   If the brand name manufacturer initiates a patent infringement action against the generic filer within 45 days of receiving notification of the Paragraph IV certification, the FDA may not grant final approval to the ANDA until the earlier of (a) the passage of 30 months, or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA.   The FDA may grant "tentative approval," but cannot authorize the generic manufacturer to go to market.

50.   As an incentive to spur generic companies to seek approval of generic alternatives to branded drugs, the first generic manufacturer to file an ANDA containing a Paragraph IV certification gets a period of protection from competition from other generic versions of the drug.

51.   Brand name manufacturers are incentivized to list patents in the Orange Book due to the high profit margins on brand name drugs and the erosion of those profits due to generic entry.

52.   Brand name manufacturers are motivated to sue any generic competitor that files an ANDA with Paragraph IV certifications even if the generic competitor's product does not actually infringe the listed patent(s) and/or the patent is invalid and unenforceable. As a result, final FDA approval of an ANDA can be delayed for up to 30 months.

**D.      Generic Competition Serves the Public Interest.**

53.   Typically, AB-rated generics cost much less than their branded counterparts.   Over time, as more generic equivalents compete with each other, prices decline even further.

54.   Since passage of the Hatch-Waxman Amendments, every state has adopted substitution laws that either require or permit pharmacies to substitute AB-rated generic

equivalents for branded prescriptions (unless the prescribing physician has specifically ordered otherwise).

55.    Once a generic equivalent hits the market, the generic quickly causes sales of the branded drug to diminish.

56.    More than 90% of prescriptions for drugs that are available in both branded and generic forms are filled with a generic.

57.    The speed with which generic drugs take over the market appears to be increasing: in a sample of drugs losing patent protection between 1991 and 1993, generics on average held a 44% market share after one year; by 2010, IMS industry data reflects that, on average, generics capture 80% of the brand's sales within 6 months.

58.    Because of the strong potential for generics to diminish sales of brand name drugs, brand name manufacturers are motivated to extend their market dominance for as long as possible.

59.    Since the passage of the Hatch-Waxman Amendments, every state has adopted laws that either require or permit pharmacies to automatically substitute AB-rated generic equivalents for brand prescriptions (unless the prescribing physician has specifically ordered otherwise).

60.    Substitution laws and other institutional features of pharmaceutical distribution and use create the economic dynamic that the launch of AB-rated generics results both in rapid price decline and rapid sales shift from brand to generic purchasing.

61.    Experience and economic research demonstrates that the first generic manufacturer to launch prices its product below the price of its brand counterpart.[5]

---

[5] FTC, AUTHORIZED GENERIC DRUGS: SHORT-TERM EFFECTS AND LONG-TERM IMPACT, at ii-iii, (Aug. 2011) ("FTC 2011 AG Study"), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-

62. Every state either requires or permits that a prescription written for the brand drug be filled with an AB-rated generic. Thus, the first generic manufacturer almost always captures a large share of sales from the brand form of the drug. At the same time, there is a reduction in average price paid for a prescription for the drug at issue (brand and AB-rated generic combined).

63. During the 180-day exclusivity period, the first filer is the only ANDA-approved generic manufacturer on the market. As recognized by the Supreme Court, it is often the case that most of a first-filer's profits are earned during the 180-day exclusivity period. *See FTC v. Actavis, Inc.*, 570 U.S. 136, 143-44 (2013). Frequently, a brand manufacturer has an authorized generic "AG" on the market during the 180-day exclusivity period.

64. If there is no AG on the market during the 180-day exclusivity period, the first-filer prices its product below the brand product, but not as low as if it were facing competition from other generics, including an AG. In these circumstances the first-filer's product competes only with the brand product. And because the brand company rarely drops the brand product price to match the first-filer, the first-filer does not face the kind of price competition it will when additional generic products—including an AG—are available. Thus, a first-filer charges higher prices, and earns much greater sales and profits without an AG being marketed alongside it during the 180-day exclusivity period.

65. Once additional generic competitors enter the market, the competitive process accelerates and multiple generic sellers typically compete vigorously with each other for market share, lowering prices and driving them down toward marginal manufacturing costs.[6]

---

long-term-impact-report-federal-trade-commission.pdf (last accessed June 19, 2018); FTC Pay-for-Delay Study, at 1.

[6] *See, e.g.*, Patricia Danzon & Li-Wei Chao, *Does Regulation Drive Out Competition in Pharmaceutical Markets?*, J.L. & ECON. (Oct. 2000); Tracy Regan, *Generic Entry, Price Competition, and Market*

66. According to the FDA and the FTC, the greatest price reductions are experienced when the number of generic competitors goes from one to two.     In that situation, there are two commodities that compete on price. Some typical estimates are that a single generic launch results in a near term retail price reduction of around 30%, but that with two generic entrants near term retail price reduction is about 50% or more.

67. Soon after generic competition begins, the vast majority of the sales formerly enjoyed by the brand shift to generic sellers.

68. A 2011 FTC Study found that generics captured 80% or more of sales in the first six months.[7] In the end, total payments to the brand manufacturer of the drug decline to a small fraction of the amounts paid prior to generic entry. This is so because, although generic drugs are clinically identical to their brand counterparts, they are typically sold at substantial discounts from the brand price.

69. Generic drugs save consumers an estimated $8 to $10 billion a year at retail pharmacies. Even more billions are saved when hospitals use generics.

**E.     Pay-for-Delay Agreements**

70. Pay-for-delay agreements occur when the brand-name pharmaceutical companies pay generic manufactures to delay entering their cheaper, generic versions of the drug to the market, in order to prevent costly patent lawsuits.

71. These unlawful pay-off deals are often referred to as "pay-for-delay" agreements or "exclusion payment" agreements. The first-filer's agreement to delay marketing its drug may also prevent other generic manufacturers from marketing theirs. Later ANDA filers have more

---

*Segmentation in the Prescription Drug Market*, INT'L J.L. INDUS. ORG. (Aug. 2007); R. Frank, *The Ongoing Regulation of Generic Drugs*, NEW ENG. J. MED., v. 357, pp. 1993-96 & n.20 (Nov. 2007).
[7] FTC 2011 AG Study, at 66-67.

modest financial expectations because they have no expectation of any form of market exclusivity. By the time they enter the market there is at least the brand and one other generic on the market (and often a second generic in the form of an AG) and, thus, the drug has already been commoditized.

72.    When an anticompetitive agreement with the first filer is already in place, however, litigation becomes less attractive to later filers. The later generic manufacturers know that the first filer is not leading the charge against the brand's patent(s) (and has sometimes stipulated to the validity or enforceability of the patents as part of an anticompetitive, reverse payment settlement). The later generics have to bear the brunt of the litigation costs themselves, and, upon prevailing in the patent litigation, expect to face competition from at least the first filer generic, and typically an authorized generic as well, despite having expended time and resources litigating the infringement case.

73.    The first settlement between a brand and first-filer generic (such as the Exclusion Payment Agreement at issue here) will often provide that, if a later generic filer launches its generic before the delayed date agreed to by the brand and the first filer, the first filer is permitted to launch then as well – greatly reducing the incentive the later filer would otherwise have to continue fighting to enter as soon as possible.

74.    Thus, some later generics decide to simply give in to the conspiracy between the brand manufacturer and the first-filer generic and agree to drop their challenges to the brand's patent(s) and stay off the market until after entry by the first filer.

### F.    Anticompetitive Acceleration Clauses

75.    Brand and generic manufacturers can make their Exclusion Payment agreements more effective by including "acceleration" clauses in their settlement agreements. The

15

manufacturers may provide that, in exchange for the No-AG clause, the first-filer will delay entering the market until a certain date in the future. The acceleration clause then provides, however, that if any other generic manufacturer succeeds in entering the market before that date, the first filer's entry date is accelerated to that earlier date.

76. Despite their name, acceleration clauses delay generic entry. The purpose and effect of an acceleration clause is to dramatically reduce any other generic manufacturer's incentive to try to enter the market before the first-filer.

77. Absent the acceleration clause, other generic manufacturers would have a possibility of entering the market before the first-filer, thereby enjoying a substantial period with the only ANDA-based generic product on the market. By eliminating this possibility, an acceleration clause results in delayed generic entry in at least two ways: (i) the clause directly reduces other generic manufacturers' incentives to file an ANDA or continue litigation in order to gain entry before the first-filer, and (ii) by eliminating the threat to the first-filer's 180-day exclusivity, the clause compensates the first-filer for delaying its entry into the market. In short, the acceleration clause eliminates other generic manufacturers' competitive threat to the first filer, in return for which the first-filer agrees to later entry than it otherwise would.

78. The Chairman and CEO of generic manufacturer Aponte, Inc. twice testified to Congress that acceleration clauses, or "poison pill" provisions, represent "the primary anticompetitive aspects of settlements" because they "eliminate any incentive for a subsequent filer to continue to litigate for earlier market entry."[8]  The clauses deter others from entering earlier and cause the first-filer to accept a later entry date:

---

[8] *Protecting Consumer Access to Generic Drugs Act of 2007: Hearing on H.R. 1902 Before the Subcomm. On Commerce, Trade, and Consumer Protection of the H. Comm. on Energy & Commerce*, 110th Cong., at 65, 67 (2007) (statement of Bernard Sherman, CEO, Apotex, Inc.), *available at* http://www.gpo.gov/fdsys/pkg/CHRG- 110hhrg38992/pdf/CHRG-110hhrg38992.pdf.

[N]o subsequent filer is going to take up the patent fight knowing it will get nothing if it wins. Consumers are the biggest losers under this system. If subsequent filers do not have the incentive to take on the cost of multimillion patent challenges these challenges will not occur. Weak patents that should be knocked out will remain in place, unduly blocking consumer access to generics. The challenges to brand patents by generic companies that Hatch-Waxman was designed to generate will decrease. And settlements that delay consumer access to the generic will, in turn, increase.[9]

79. Most settlement agreements between brand and generic manufacturers provide that the agreement's terms are confidential, except that the brand manufacturer is permitted to advise other generic manufacturers of the existence of the acceleration clause. The purpose and effect of permitting this disclosure is to dissuade other generic manufacturers from trying to enter the market before the delayed entry date to which the first-filer agreed.

## V.    FACTUAL ALLEGATIONS

### A.    Amgen Launches Sensipar and Earns Billions of Dollars

80. In March 2004, Amgen received FDA approval for New Drug Application #021688 for Sensipar tablets. Sensipar is indicated for the treatment of secondary hyperparathyroidism in patients with chronic kidney disease on dialysis, and the treatment of hypercalcemia in patients with parathyroid carcinoma. Amgen currently markets Sensipar in three strengths: 30 mg, 60 mg, and 90 mg.

81. Beginning in April 2004, Amgen marketed, distributed, and sold Sensipar tablets throughout the United States. Sales of Sensipar in the U.S. grew rapidly, ultimately reaching over $1.3 billion annually in 2017.

---

[9] *Protecting Consumer Access to Generic Drugs Act of 2009: Hearing on H.R. 1706 Before the Subcomm. On Commerce, Trade, and Consumer Protection of the H. Comm. on Energy & Commerce*, 111th Cong., at 218 (2009) (statement of Bernard Sherman, CEO, Apotex, Inc.) (hereinafter "Apotex 2009 Statement"), available at http://www.gpo.gov/fdsys/pkg/CHRG-111hhrg67822/pdf/CHRG-111hhrg67822.pdf.

**B.      Amgen Acquires the '405 Patent**

82. The U.S. Patent and Trademark Office ("PTO") issued the '405 patent in 2016.

83. The '405 patent purportedly describes "a pharmaceutical composition compromising a therapeutically effective amount of calcium receptor-active compound and at least one pharmaceutically acceptable excipient, wherein the composition has a controlled dissolution profile."[10]

84. The '405 patent was assigned to Amgen, and Amgen is the owner of the '405 patent. Amgen listed the patent in the Orange Book.

**C.      Generic Manufacturers Seek FDA Approval for Generic Versions of Sensipar**

85. As explained above, pharmaceutical companies can seek FDA approval of generic versions of a brand drug by filing an ANDA. To have an ANDA approved, a company must demonstrate, among other things, that its proposed generic is therapeutically equivalent to the brand drug.

86. Beginning at least as early as March 2008, over a dozen generic drug manufacturers filed ANDAs seeking approval of generic versions of Sensipar. These manufacturers included (among others) Teva, Aurobindo Pharma, Alkem Laboratories, Hetero Labs, Apotex Corp., Sun Pharmaceutical Industries, Lupin Pharmaceuticals, Cipla Ltd., Macleods Pharma, Mylan Pharmaceuticals, Amneal Pharmaceuticals, Dr. Reddy's Laboratories, Breckenridge Pharmaceutical, Micro Labs, Piramal Healthcare, Strides Pharma, Ajanta Pharma, Torrent Pharma, Heritage-Emcure, and Zydus Pharmaceuticals.

87. As part of their ANDAs, each manufacturer submitted a Paragraph IV certification against Amgen's '405 patent. In these Paragraph IV certifications, each ANDA applicant

---

[10] Abstract, United States Patent No. 9,375,405.

represented that the '405 patent was invalid, unenforceable, or not infringed by the generic's proposed ANDA product.

**D.    Amgen Sues the Generic ANDA Applicants for Infringement of the '405 Patent**

88. Each ANDA applicant provided notice of its respective Paragraph IV certifications to Amgen. Because filing a Paragraph IV certification constitutes an act of infringement, *see* 35 U.S.C. § 271(e), upon receipt of these notices, Amgen sued each generic ANDA applicant for patent infringement.

89. As the patent litigations continued, certain generic manufacturers settled with Amgen. The table below lists the generic companies that settled with Amgen, as well as the dates that Amgen's infringement actions were dismissed:

| Generic Company that Settled with Amgen | Date Amgen's Infringement Action was Dismissed |
|---|---|
| Aurobindo Pharma | March 23, 2018 |
| Cipla Ltd. | March 5, 2018 |
| Apotex Corp. | September 11, 2017 |
| Sun Pharmaceutical | November 2, 2017 |
| Mylan Pharmaceuticals | March 5, 2018 |
| Dr. Reddy's Laboratories | March 5, 2018 |
| Breckenridge Pharmaceutical | September 21, 2017 |
| Strides Pharma | March 5, 2018 |
| Hetero Labs | November 2, 2017 |
| Ajanta Pharma | November 9, 2017 |
| Micro Labs | September 20, 2017 |

| Alkem Laboratories | May 9, 2018 |
| Lupin Pharmaceuticals | April 23, 2018 |
| Macleods Pharma | April 10, 2018 |
| Torrent Pharma | June 12, 2018 |
| Heritage-Emcure | December 7, 2018 |

90. Certain generic manufacturers, as part of their settlements with Amgen, received acceleration clauses that permit them to market their generic versions of Sensipar before their settlement-prescribed market entry dates. One condition that permits earlier entry is the launch of a competing generic version of Sensipar. As is typical, these acceleration clauses build in a short delay period, during which the settling generics must refrain from sales in order to permit the brand the opportunity to seek judicial relief, if warranted, to stop the generic that launched.

91. In a 2018 SEC quarterly filing, Amgen disclosed that in the consent judgments with certain generic manufacturers (including Cipla, Strides, and Aurobindo):

> [T]he parties stipulated to an entry of judgment of infringement and validity of the '405 Patent and an injunction prohibiting the manufacture, use, sale, offer to sell, importation of, or distribution into the United States of the applicable defendants' cinacalcet product during the term of the '405 Patent ***unless specifically authorized pursuant to the confidential settlement agreement.***[11]

The bold, italicized language reflects, among other things, the parties' agreements to acceleration clauses. Indeed, an Alliance Bernstein analyst has stated that Amgen's Sensipar settlements "all

---

[11] Amgen SEC Form 10-Q at 25-26 (filed Apr. 25, 2018),
http://investors.amgen.com/phoenix.zhtml?c=61656&p=irol-
SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbS9maWxpbmcuG1sP2lwYWdlPTEyMj
AxMjc1JkRTRVE9MCZTRVE9MCZTUURFU0M9U9U0VDVElPTl9FTlRSJUkkUmc3Vic2lkPTU3
(emphasis added).

sensibly contain acceleration clauses, where the settling generic can launch if another generic enters the market."[12]

92. Although many generic manufacturers settled with Amgen, others—Teva, Aurobindo, Amneal, Piramal, and Zydus—continued litigating through a four-day bench trial, held in March 2018.

93. In July 2018, the Court found that Teva, Amneal, and Piramal did not infringe the '405 patent.[13] *See Amgen Inc. v. Amneal Pharm. LLC*, 328 F. Supp.3d 373 (D. Del. 2018).

94. In September 2018, Amgen appealed the Court's ruling of non-infringement in favor of Teva, Amneal, and Piramal to the Federal Circuit. That appeal is pending.

### E.    Teva Receives FDA Final Approval and Launches Its Generic Version of Sensipar

95. Because Teva, Amneal, and Piramal had received non-infringement rulings, these manufacturers needed only to obtain FDA final approval of their ANDAs to launch their generic versions of Sensipar, regardless of the pendency of Amgen's appeal.

96. On December 27, 2018, the FDA granted final approval to Teva's ANDA for generic Sensipar. Upon receiving approval, Teva launched its generic version the drug.

97. Over an approximately one-week period, Teva sold roughly *six weeks'* worth of generic Sensipar, realizing an estimated *$59 million* in profits, assuming a 25% discount off Sensipar's price. Teva's launch also caused Amgen to lose an estimated *$79 million* in profits.[14] For drug purchasers and insurers, the benefits of Teva's launch were immediate, saving millions of dollars by purchasing—or reimbursing purchases of—Teva's generic product.

---

[12] Sutter, *supra* note 2.
[13] The Court also found that Zydus had infringed the '405 Patent, *see Amgen*, 328 F. Supp.3d at 399-400, but Zydus is currently appealing that ruling.
[14] Sutter, *supra* note 2.

98. Moreover, had Teva continued selling generic Sensipar, Teva's entry would have triggered the acceleration clauses in settlements Amgen had with other generic manufacturers. If the other settling generics entered, the price for generic versions of Sensipar would have dropped significantly below that offered by Teva, as is typical when multiple generics compete.[15] In addition, as more generics entered the market to compete, Amgen's share of branded and generic Sensipar tablet sales would have eroded by 90%.[16] Therefore, Amgen had to move quickly once Teva launched—both to stop sales by Teva and to avoid triggering the acceleration clauses in its patent settlements with other generics.

### F.    Amgen and Teva Enter an Unlawful Market Division Agreement to Eliminate and Delay Generic Competition

99. Having lost against Teva at trial, to stop Teva's sales of its competing generic product, Amgen had to either persuade the district court or the Federal Circuit to stay the noninfringement ruling and to enjoin Teva's sales—or engage in self-help. Amgen chose the latter and negotiated an agreement to end Teva's competitive threat and keep Teva off the market for an extended period of time.

100. On January 2, 2019, Amgen and Teva executed an agreement that ended competition from Teva's generic product. Under the agreement, Amgen also agreed to drop its appeal of the Court's non-infringement decision as it related to Teva and pay Teva for licenses to other Teva products. In exchange, Teva agreed to (1) cease all sales of generic Sensipar; (2) delay all future sales until mid-year 2021—*i.e.*, two and one-half years; and (3) pay Amgen an

---

[15] FTC Staff Study, Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions (Jan. 2010), at 8, https://www.ftc.gov/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billionsfederal-trade-commission-staff ("Publicly available information about recent generic launches suggests that a generic market typically matures about one year after the first entrant comes on the market. The generic penetration rate at that point is about 90% on average . . .").
[16] *Id.*

undisclosed sum of money, which apparently represented a portion of Teva's generic Sensipar sales, to Amgen.[17]

101. As a result of the agreement between Amgen and Teva:

(a) Amgen eliminated existing generic competition from Teva, which was costing it tens of millions of dollars in lost profits;

(b) Amgen also eliminated imminent competition by other generics, whose acceleration clauses otherwise would have triggered and allowed them to compete as well;

(c) Teva retained tens of millions of dollars in profits from selling six weeks' worth of product in a week;

(d) Teva eliminated the risk that the Federal Circuit might overturn the favorable non-infringement ruling on the '405 patent;

(e) Teva secured both a certain entry date comparable to the dates that the other generics who had settled received and, in all likelihood, an acceleration clause that assured Teva's earlier entry if another generic launched first; and

(f) Teva received additional value from Amgen's agreement to pay Teva for licenses to other Teva products.

102.    Thus, two competitors—Amgen and Teva—agreed to divide the market for Sensipar and Teva's generic version of the product. Amgen received Teva's promise not to enter for another two and one-half years, until mid-2021, unless another generic broke Amgen's monopoly by launching first. By its agreement with Teva, Amgen maintained its monopoly of branded and generic Sensipar sales.

---

[17] Sue Sutter, *Launch Abbreviated: Teva Halts US Generic Sensipar Sales After Patent Deal With Amgen*, Pink Sheet (Jan. 3, 2019).

103. A week after entering their illegal agreement, Amgen and Teva applied jointly to the Court to vacate its non-infringement judgment in favor of Teva and, instead, to enter a judgment stating that Teva's "manufacture, use, sale, offer to sell, and distribution of [its generic Sensipar] in the United States and importation of [its generic Sensipar] into the United States, *would infringe* the ['405] Patent."[18] Defendants' attempt to rewrite the Court's trial ruling confirms the anticompetitive intent underlying their market division agreement.

104. The other generics that were blocked from entering the market took action in response to the Amgen-Teva agreement. In January 2019, Cipla Ltd. filed a complaint against Amgen, alleging, among other claims, that the Amgen-Teva agreement violated the antitrust laws.[19] Cipla Ltd. also opposed Defendants' motion to vacate the district court's non-infringement ruling, as did Sun Pharmaceutical, another generic that had settled with Amgen.

105. The Amgen-Teva market division agreement injured Plaintiff and members of the Class. They lost the ability to buy Teva's less expensive generic version of Sensipar. Moreover, but for the unlawful agreement, Teva's sales would have allowed market entry by other generic manufactures, further driving the price down. At least Aurobindo Pharma, Cipla Ltd., Mylan Pharmaceutical, Strides Pharma, and Sun Pharmaceutical each had FDA final approval at the time of Teva's launch, and Teva's continued sales would have triggered the acceleration clauses in their settlements with Amgen. Such increased generic competition would have driven down the prices of generic versions of Sensipar below Teva's discount. Today, however, there is no such competition as a result of Defendants' conduct.

---

[18] *Amgen Inc. v. Amneal Pharmaceuticals LLC*, No. 16-853, ECF No. 412 (D. Del., filed Jan. 9, 2019) (emphasis added).
[19] *See Cipla Ltd. v. Amgen Inc.*, No. 19-cv-00044 (D. Del.).

## VI.    THE ANTICOMPETITIVE EFFECTS ON INTERSTATE AND INTRASTATE COMMERCE

106. Defendants' anticompetitive scheme had the purpose and effect of unreasonably restraining trade by eliminating competition between Amgen and generic competitors. But for the market division agreement, Teva would have continued selling its generic Sensipar after January 2, 2019, and other FDA-approved generics would have soon launched their own generic versions of Sensipar.

107. But for Defendants' illegal conduct, Plaintiff and members of the Class would have paid less for branded and generic versions of Sensipar. Defendants' conduct proximately caused Plaintiff's and the Class' injuries because it forced them to pay tens of millions of dollars in overcharges on purchases of Amgen's branded Sensipar.

108. If Defendants had not blocked generic competition for branded Sensipar, Plaintiff and members of the Class would have paid less for cinacalcet hydrochloride tablets.

109. As a result of the delay in generic competition caused by Defendants' anticompetitive scheme, Plaintiff and members of the Class paid, and continue to pay, more for branded and generic Sensipar than they would have paid absent Defendants' illegal conduct.

110. Defendants' restraints of competition in the market for branded and generic versions of Sensipar have substantially affected both interstate and intrastate commerce.

111. At all material times, Amgen manufactured, promoted, distributed, and sold substantial amounts of branded Sensipar in a continuous and uninterrupted flow of commerce across state lines and throughout the United States. Defendants' anticompetitive conduct also had substantial intrastate effects in every state of purchase in that, among other things, retailers within each state were foreclosed from offering less-expensive generic versions of Sensipar to

25

purchasers within each state, which directly impacted and disrupted commerce for consumers and third-party payors within each state.

112. At all material times, Defendants transmitted funds and contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state lines in connection with the sale of branded and generic versions of Sensipar.

113. Defendants' unlawful agreement enabled Amgen to charge prices in excess of what they otherwise would have been able to charge to Plaintiff and members of the Class absent the Defendants' agreement.

114. These prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

## VII.    MONOPOLY POWER AND MARKET DEFINITION

115. To the extent the conduct here may be held subject to the Rule of Reason—and thus requires pleading a relevant product and geographical market—the relevant product market is cinacalcet hydrochloride tablets in 30 mg, 60 mg, and 90 mg strengths, including branded Sensipar and its bioequivalent (*i.e.*, AB-rated) generic versions of Sensipar. The relevant geographic market is the United States, including its territories, possessions, and the Commonwealth of Puerto Rico.

116. At all relevant times, Amgen has had monopoly power over the market for cinacalcet hydrochloride tablets. Direct evidence of Amgen's monopoly power includes, among other things, the abnormally-high price-cost margins enjoyed by Amgen prior to entry of generic versions of Sensipar and Amgen's ability to profitably maintain the price of Sensipar above competitive levels.

117. A small but significant non-transitory price increase above the competitive level for Sensipar by Amgen would not cause a loss of sales sufficient to make the price increase unprofitable.

118. Other drugs that are not AB-rated to Sensipar cannot be substituted automatically for Sensipar by pharmacists and do not exhibit substantial cross-price elasticity of demand with respect to Sensipar. Thus, they are not economic substitutes for, nor reasonably interchangeable with, Sensipar.

119. Pharmaceutical products with cinacalcet hydrochloride as the active ingredient have pharmacological properties that differentiate them from other drugs for treating secondary hyperparathyroidism and hypercalcemia. The existence of other products indicated for the treatment of secondary hyperparathyroidism in patients with chronic kidney disease and hypercalcemia in patients with parathyroid carcinoma or other illnesses has not significantly constrained Amgen's pricing of Sensipar.

120. Amgen needed to control only Sensipar and its AB-rated generic equivalents, and no other products, in order to maintain the price of Sensipar profitably at supracompetitive prices. Only the market entry of a competing, AB-rated generic version of Sensipar would render Amgen unable to profitably maintain its prices of Sensipar without losing substantial sales.

121. Amgen, at all relevant times, enjoyed high barriers to entry with respect to competition to the above-defined relevant product market due to patent and other regulatory protections and high costs of entry and expansion.

122. Amgen has maintained and exercised the power to exclude and restrict competition to Sensipar and AB-rated generics.

27

123. At all relevant times, other than the roughly one-week period of Teva's sales, Amgen's market share in the relevant market was at or near 100%.

## VIII.  CLASS ACTION ALLEGATIONS

124. Plaintiff brings this action on behalf of itself and all others similarly situated as a class action under Rules 23(a), (b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All persons and entities that directly purchased Sensipar or its AB-rated generic equivalents from Defendants, beginning at least as early as January 2, 2019 until the effects of Defendants' conduct cease ("Class Period"), anywhere in the United States.

125. Excluded from the Direct-Purchaser Class are Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities.

126. Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Plaintiff believes that there are thousands of members of the Class widely dispersed throughout the United States. Moreover, given the costs of complex antitrust litigation, it would be uneconomic for many plaintiffs to bring individual claims and join them together.

127. Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and members of the Class were harmed by the same wrongful conduct by Defendants in that they paid artificially inflated prices for branded and generic Sensipar and were deprived of the benefits of earlier and more robust competition from less-expensive generic equivalents of Sensipar as a result of Defendants' wrongful conduct.

128. Plaintiff will fairly and adequately protect and represent the interests of the members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class.

129. Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation and with experience in class action antitrust litigation involving pharmaceutical products.

130. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendants have acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

131. Questions of law and fact common to the Class include, but are not limited to, the following:

    (a)   Whether Defendants' conspired to delay generic competition in the market for cinacalcet hydrochloride tablets;

    (b)  Whether Defendants' agreement was a *per se* violation of federal antitrust laws;

    (c)  Whether Defendants' agreement violated federal antitrust laws under a "quick look" analysis;

    (d)  Whether Defendants' agreement violated federal antitrust laws under a Rule of Reason analysis;

    (e)  To the extent the Rule of Reason applies, whether the relevant product market is cinacalcet hydrochloride tablets;

    (f)  To the extent the Rule of Reason applies, whether the relevant geographic market is the United States, including its territories, possessions, and the Commonwealth of Puerto Rico.

    (g)  Whether Amgen unlawfully maintained monopoly power through the Defendants' Agreement;

(h) Whether Defendants' scheme, in whole or in Part, has substantially affected intrastate and interstate commerce;

(i) The duration and extent of the alleged contract, combination, or conspiracy;

(j) The effect of the contract, combination, or conspiracy on the prices of generic Sensipar in the United States during the Class Period;

(k) Whether Defendants' conduct caused supracompetitive prices for generic Sensipar;

(l) Whether and to what extent the conduct of Defendants caused injury to Plaintiff and other members of the Class; and

(m) Whether Defendants' conduct harmed competition.

132. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

133. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## IX.    ANTITRUST INJURY

134. During the Class period, Plaintiff and members of the Class directly purchased Sensipar or its AB-rated generic equivalent from Defendants.  As a result of the Defendants' anticompetitive conduct, Plaintiff and members of the Class paid more for Sensipar and generic Sensipar than they would have and thus suffered substantial damages.  This is a cognizable antitrust injury and constitutes harm to competition under the federal antitrust laws.

135.  Because Defendants' unlawful conduct has successfully eliminated competition in the market, and Plaintiff and members of the Class have sustained, and continue to sustain, significant losses in the form of artificially inflated prices paid to Defendants.  The full amount of such damages will be calculated after discovery and upon proof at trial.

136.  Defendants' misconduct reduced competition in the Sensipar and generic Sensipar market, reduced choice for purchasers, and caused injury to purchasers.

137.  Defendants' anticompetitive conduct is ongoing and, as a result, Plaintiff and members of the Class continue to pay supracompetitive prices for Sensipar and generic Sensipar.

## X.    CLAIM FOR RELIEF

### COUNT I
### Anti-Competitive Conduct in Violation of Sherman Act § 1
### (Against All Defendants)

138.  Plaintiff incorporates the preceding paragraphs by reference.

139.  An agreement by competing companies to cease competing is "anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other."[20]  Defendants here entered into an unlawful market division agreement that restrained competition in the market for branded and generic versions of Sensipar. Their agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

(a) eliminate existing competition between Amgen and Teva and to prevent Teva from competing with Amgen by selling its generic version of Sensipar until mid-2021;

(b) delay entry of generic versions of Sensipar by companies other than Teva in order to maintain the period in which Amgen brand Sensipar monopolizes the relevant market; and

---

[20] *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990).

(c) raise and maintain the prices that Plaintiff and the Class Members would pay for Sensipar to and at supra-competitive levels.

140. The unlawful Amgen-Teva market division agreement is a *per se* violation of the Sherman Act, 15 U.S.C. § 1. Moreover, if the conduct alleged in this Complaint is held subject to a "quick look" analysis, it would satisfy the Supreme Court's test in *California Dental*.[21] That is, "an observer with even a rudimentary understanding of economics could conclude that the [Amgen-Teva agreement] in question would have an anticompetitive effect on customers and markets."[22]

141. Even if the conduct alleged in this Complaint is held subject to the Rule of Reason, there is no legitimate, non-pretextual, procompetitive business justification for the value Teva received that outweighs the agreements harmful effects. Specifically, under *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2237 (2013), a patent settlement agreement between a brand and generic manufacturer may be unlawful when the brand provides the generic manufacturer a "large and unjustified" payment in exchange for the generic manufacturer dropping its challenge to the brand manufacturer's patents. This is particularly the case when the size of the payment exceeds any saved or avoided litigation costs.

142. Here, in exchange for Teva's agreement to delay entering the market until mid-2021 notwithstanding its judgment of non-infringement, under the Amgen-Teva agreement, Teva received at least (a) tens of millions of dollars in profits from sales of generic Sensipar, which it retained and did not pay to Amgen and which reduced Amgen's own revenue from sales of branded Sensipar; (b) an acceleration provision, assuring Teva an ability to resume sales of its

---

[21] *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).
[22] *Id.*

generic product if another generic launched before Teva's entry date; and (c) additional value from Amgen's agreement to pay Teva to license certain other Teva products.

143. Individually and collectively, the value that Amgen transferred and Teva received under their agreement exceeded the costs of continued litigation or any arguably procompetitive benefits—and thus was "large and unjustified." Indeed, given that Teva made the calculated decision to launch at risk, presumably based on its own assessment of the strength of its arguments on appeal, it would have been unlikely to change course by withdrawing from the market just one week later absent some significant inducement by Amgen. Accordingly, the Amgen-Teva agreement is unlawful.

144. As a direct and proximate result of Defendants' violation of Sherman Act § 1, Plaintiff and the Class have been injured in their business and property throughout the Class Period.

145. Plaintiff and the Class are entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Class Members pray for relief as set forth below:

A.    Certification of the action as a Class Action pursuant to Federal Rule of Civil Procedure 23, an appointment of Plaintiff as Class Representative and its counsel of record as Class Counsel;

B.    Permanent injunctive relief that enjoins Defendants from violating the antitrust laws and requires them to take affirmative steps to dissipate the effects of the violations;

C.    That acts alleged herein be adjudged and decreed to be unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. §§ 1 and 2;

D.    A judgment against Defendants, jointly and severally, for the damages sustained by Plaintiff and the Class defined herein, and for any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages;

E.    By awarding Plaintiff and Class members pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint in this action;

F.    The costs of this suit, including reasonable attorney fees; and

G.    Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of itself and others similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil procedure 38, on any and all claims so triable.

Dated:  April 9, 2019

Respectfully submitted,

Dianne M. Nast
Erin C. Burns
Michael Tarringer
**NastLaw LLC**
1101 Market Street
Suite 2801
Philadelphia, PA  19107
215-923-9300
215-923-9302 (facsimile)
dnast@nastlaw.com
eburns@nastlaw.com
mtarringer@nastlaw.com

Michael L. Roberts
Debra G. Josephson
Stephanie E. Smith
**Roberts Law Firm, P.A.**
20 Rahling Circle
Mailing Address:  P.O. Box 241790

34

Little Rock, Arkansas 72223
501-821-5575
501-821-4474 (facsimile)
mikeroberts@robertslawfirm.us
debrajosephson@robertslawfirm.us
Stephaniesmith@robertslawfirm.us